## No. 13,550.

### BLACKETT *v.* THE PEOPLE.
(52 P. [2d] 389)

Decided November 25, 1935.

8

Mr. CHARLES T. MAHONEY, Mr. E. J. PLUNKETT, Mr. CHARLES A. MURDOCK, for plaintiff in error.

Mr. PAUL P. PROSSER, Attorney General, Mr. CHARLES H. QUEARY, Assistant, Mr. WALTER F. SCHERER, Assistant, for the people.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

PLAINTIFF in error was convicted of the crimes of larceny as bailee and embezzlement, and sentenced to the penitentiary for a term of from two to three years. To this judgment, he assigns error. A codefendant, H. W. West, joins in the abstract of record but prosecutes a separate writ of error.

In an information containing three counts, filed September 7, 1933, Blackett, together with H. O. West, L. H. Janney, Norman Franklin, E. Mendelson and John Doe Scott, were, by the first count charged with larceny as bailees, in the second count with embezzlement and in the third count, embezzlement of a check. Upon the trial, the third count was withdrawn. All counts related to the same transaction involving $200 in money, the property of W. N. Ward. Franklin and Mendelson were not apprehended and Janney was acquitted upon direction of the court.

A brokerage concern known as the North American Finance Company had operated in Denver for a number of years and in 1933, eighty-five per cent of its stock was acquired by Mendelson. The remaining stockholders were Otto Moore and Finley Dye. Moore resigned as vice president May 23, 1933. The operations of the company were conducted through E. A. Pierce and Company, a brokerage concern of New York City. All trades consummated through Pierce and Company were confirmed by Frank Worth, as secretary of the North American Company, and could not otherwise be consummated. Worth, Dye and Moore were directors of this company and are presumably without any blame in its operations.

March 20, 1933, Mendelson was appointed "General Manager of the North American Finance Company with full power to direct the ministerial acts of the company."

Another organization known as the Security Digest Company had been operated by defendant Franklin since November, 1932. Mendelson gained its control, and in April, 1933, incorporated the company. West signed the articles of incorporation at Mendelson's request, was likewise made a director, and later he was named treasurer by Mendelson. As treasurer, West's was the only authorized signature at the bank, but he had no authority to draw money except under Mendelson's direction. Mendelson likewise named Blackett president of the Security Digest Company. No meetings were held and no stock issued. Neither Blackett nor West held any stock. They were dummy officers and directors. Both concerns were in existence, and, so far as the record discloses, each was operating a legitimate business long before the Ward transaction. Mendelson obtained control of both companies, operated them in the same quarters and paid the rent therefor. Blackett was employed as a market analyst, and through information gained from various publications, wire and letter service, advertised and published a market service.

Ward, the complaining witness, wrote for data. Defendant West answered the inquiry, and then defendant Janney called on him and obtained his signature to an agreement with the Security Digest Company (exhibit A), entitled "Discretionary Power." This agreement was explained to Ward, according to its written terms, as a trading agreement, and such it was, whereby the Security Digest Company accepted money for the purpose of trading in stocks and the Security Digest Company was to share in the profits. Ward paid $200 into this fund at the time, in the form of a check payable to the Security Digest Company. In July, 1933, less than one month thereafter, he, by letter, demanded a return of his money. He made several demands thereafter by telephone and

letter, but never received his money. He testified that he never saw Blackett or talked to him and that he never saw West. The check was deposited in the American National Bank by West to the account of the Security Digest Company. West testified that he received the check from Mendelson, who said, "This is a trading account and has already been taken care of by deposit of funds. Take this and put it in your account." The testimony of Ward shows a transaction between himself and the Security Digest Company, personal dealings with Janney, who was acquitted, and no personal deals with West or Blackett. He said nothing about Mendelson, or the North American Finance Company, and there is no evidence that the latter had anything to do with the transaction. As already stated, Mendelson owned the controlling interest in both concerns; and that all company operations were under his direct control, is shown by the testimony of Charline Essley, a stenographer for the Security Digest Company, testifying for the people, who said that Mendelson was in control of both companies and "as far as I can tell you, he was the whole thing." She further stated that Blackett and West were merely employees of the company. The Ward transaction was with Janney for the Security Digest Company. His money was paid to it and all monies paid out of the account of the Security Digest Company, as shown by the evidence, were paid under and upon the direction of Mendelson. The money was to be used in a speculative trading account as above noted. It is to be borne in mind that Blackett and West were charged with larceny as bailee and with embezzlement and we are to determine from the record whether these charges were properly proven.

██ ██ The charge of larceny as bailee, as applied in this case, necessarily must carry a bailment. The charge of embezzlement as here applied must be substantiated by proof that the defendants appropriated the money to their own use; further that the money was in

the possession of the accused at the time of the conversion and that he sustained a fiduciary relationship to Ward; that the manner in which he here dealt with the property constituted a conversion or appropriation; and that he had a fraudulent intent to deprive the owner of the money. There are other necessary elements that need not be discussed in this case. We believe certain elements to be lacking in the proof submitted by the people against the defendants Blackett and West.

Blackett was in reality and fact only an employee of the Security Digest Company. Mendelson requested him to act as a temporary officer for the purpose of its incorporation and until Mendelson could have it functioning; to this Blackett consented, stating to Mendelson that he would not be in any way interested or connected with the financial end of the institution. He knew nothing of the preparation of the incorporation papers until they were submitted to him for signature. He believed he was to serve as an officer for ten or fifteen days. He was employed directly by Mendelson and in no way participated in any profits and received nothing whatsoever from the sale of the stock in this or the other company. He received nothing but a part of his salary. Mendelson disappeared about August 22, 1933, and the offices of the company were raided shortly thereafter. After the raid Blackett tried to locate Mendelson in various principal cities, *went to see the district attorney and offered to assist in locating Mendelson.* Mendelson owed him about $700 as salary. He never had anything whatsoever to do with the disbursements of money in connection with his work as statistician. Mendelson had paid for a stock information service which was used in the preparation of the market sheet issued by the Security Digest Company. He furnished and paid for stenographic service, and worked out and prepared Exhibit BB, the discretionary power used by the Security Digest Company in obtaining subscribers to this market service. Blackett neither received the money, traded with it, nor

in any way disposed of it, and there is no showing that he appropriated or converted any part of it. He was not in control of the handling thereof. He did not occupy a fiduciary relation to Ward as bailee, or in any other respect, and he did not at any time hold any part of the money by virtue of his employment or official connection with the company. The presumption of innocence and good faith followed Blackett until overcome by substantial proof. From all the connections Blackett was shown to have had with this Ward transaction, it does not sufficiently appear that he ever entertained a fraudulent intent. The whole matter was an unfortunate one from Ward's standpoint, but he made his deal, gave his money for speculative purposes to a defendant who was acquitted, and if the venture failed, through or by reason of other conditions over which Blackett had no control, Ward must abide the loss of his misadventure until the guilty party, if any, is apprehended. So much for the insufficiency of the proof as against Blackett.

From our examination of the testimony of all the witnesses who testified relative to other transactions, we are inclined to the view that there is merit in the contention of defendant that some of the transactions testified to were not similar transactions. In the majority of such instances, the testimony related to transactions by witnesses with the North American Finance Company, which had no connection with the Ward deal, with Mendelson, a defendant not before the bar, and with Janney a defendant, whom the jury was directed to acquit. It also related to conversations and transactions between third parties and Mendelson. All of these transactions were of different dates and took place under different circumstances than that of the Ward case; in fact so different in some instances that West and Blackett did not appear at all and in one case—that of the transaction testified to by people's witness Minner—there was a contract entirely different from that relied upon in the Ward transaction, and in the transactions claimed to be similar.

The connection of Blackett and West with the transaction appears after the deal had been consummated by other parties and then their only connection was that of employees, supervised and directed by the owner of the concern. The evidence of dissimilar transactions was of such character that we cannot say the jury was not prejudicially influenced against the defendants. There is no showing that these other transactions were a part of a plan or design on the part of the defendants, as employees, in fact of Mendelson, to defraud Ward, and the admission of evidence concerning such transactions constituted prejudicial error. Evidence of some of these so-called similar offenses, in which either of the defendants, Blackett or West, had some slight participation, would tend to show that defendants had committed crimes, if crimes they were, wholly independent of the one for which they were on trial. After such evidence was received, a denial of the right of defendants to cross-examine as to the North American Finance Company and the Security Digest Company, was clearly erroneous.

It appears that the prosecution introduced the evidence of other so-called similar offenses, ostensibly for the purpose of showing that these defendants had a "plan, scheme and design" to defraud, of which the Ward transaction was a part. If the facts would substantiate any such theory, then a conspiracy existed, and this is not a conspiracy case. The charge as laid by the first count, requires a bailment, and by the second count, an individual embezzlement. The case can stand only by sufficient proof of the charges as made. A careful examination of the testimony concerning the alleged similar offenses, together with the written authority or "discretionary power" signed in most instances, clearly reveals that no bailment existed. Neither does it tend to show an embezzlement by either of these defendants, or a conversion to their *own use,* of the monies or stocks involved in any of those transactions or in the case at bar. A confusion undoubtedly arose in the minds of the

court and prosecuting officers concerning the application of the statute on embezzlement. What actually became of the money involved in this case, or in the alleged similar transactions is not disclosed by the evidence, and it is shown that if there was a wrongful use or disposal of the money that it occurred through other than the individual acts of Blackett or West, and no showing whatever is made that either converted money to his own individual use. Blackett had no connection whatever with the disbursement of the company money. West checked out of the company account only upon the direction of Mendelson, who escaped. Checking out the funds to third parties, and for company expenses and refunds to others, is not included in the words ''to his own use.'' To hold otherwise, would jeopardize the integrity and liberty of many honest men who happen to be officers of failing concerns, and who pay out its funds to settle its business affairs. It would subject every such officer to a charge of embezzlement. These defendants, together or singly, did not organize a company, or enter into a scheme or plan, to do what apparently was done by Mendelson in these cases. They were mere employees and participants in the affairs of a corporation, over which they had no control, and as such they are not presumed to know, neither are they chargeable with knowledge of its affairs or management, whereby criminal liability would attach. Ward, by his ''discretionary power,'' constituted the company—which was under Mendelson's control—his agent. Neither Blackett nor West acted as the agent of Ward. Neither of the defendants controlled the corporation or its board of directors. The intent of either defendant to misuse Ward's money is not shown and such intent is necessary to sustain a charge of embezzlement.

The court, over the objection of defendant, erroneously permitted witness Fiedler to testify concerning conversations had with third parties out of the presence of the defendant. The court seemed to be con-

trolled by the fact that the defendants had some official connection with one or the other of the two companies to which allusion was made in the testimony, and that by reason of the failure of either or both of such concerns, whereby the complaining witness was unable to secure a return of the money placed therewith, that they as such officers were guilty of the crimes as charged. This is evidenced by the court's Instruction No. 14, as follows: "An officer of a corporation, through whose acts the corporation commits an offense against the laws of the state, is himself also guilty of the same offense." There is no evidence in this case that the corporations, through the acts of Blackett or West, committed an offense. Before they could be found guilty, it first had to be shown that they did the things that constituted the offense and that they personally committed the crime charged to the companies, even though they did so in the name of the corporations, and the instruction as given is so lacking in completeness as to be misleading or confusing to the jury. The instruction apparently was based on the case of *Overland Cotton Mill Co. v. People,* 32 Colo. 263, 75 Pac. 924, which presents a different set of facts. It is clear in this case that the money involved was delivered to the corporation and not to either of the defendants personally; therefore, the only applicable portion of the embezzlement statute is: " * * * If any officer, agent, * * * of any incorporated company, * * * who in any manner receives or collects money or any other property for the use of or belonging to another, embezzles or fraudulently converts *to his own use* * * * without the consent of his company, employer, master or owner of the money or goods collected or received, any money, goods or property of such company, employer or master, or another * * * which has come into his possession or under his care in any manner whatsoever, he shall be deemed guilty of larceny, and punished accordingly." C. L. '21, §6734.

Instruction No. 15, given by the court, is as fol-

lows: "An agent of a corporation is presumed to have that knowledge of its affairs particularly under his control and management which, by the exercise of due diligence, he would have ascertained." Objection is made that the instruction is not applicable to the facts in this, a criminal case, since it is definitely proven that the management and control of both companies involved under the evidence was under the control of Mendelson and not the defendants on trial. A defendant in a criminal case is never presumed to have knowledge of the affairs of a corporation; it must be proven. Neither is he required to exercise due diligence, failing in which he would be subject to a criminal prosecution. It is elementary that in all criminal cases no such presumptions are indulged, and the positive burden is upon the prosecution to prove, beyond a reasonable doubt, that the defendant knowingly, intentionally and feloniously committed the crime charged. It goes to the very essence of the offense, and in this case it was necessary to prove the individual act and intent of the defendants. By the instruction given, the jury was plainly told that the defendants were presumed to have knowledge of the affairs of the corporation, in face of the undisputed evidence that its affairs and management were under the control of Mendelson. It was the exclusive province of the jury to determine from all the evidence and circumstances of the case, what was the intent of the defendants in their connection with the entire transaction. This instruction precluded a consideration by the jury of the question of intent, as well as the question of fact, as to whether the defendants did have guilty knowledge of the unlawful operations of the company, if any. This was for the jury to find from all of the evidence and circumstances in the case and not from a direction of the court. The instruction is erroneous and, having been given in the charge to the jury, was prejudicial to the defendants.

Finally, objection is made to the verdict. As before stated, the information contained two counts. The

crimes charged may be properly joined in the same information, *provided* that on the trial, the evidence *shall* be limited to one transaction. When the evidence is so limited, if sufficient, it supports the charge of one crime, and not of two separate and distinct offenses. The court instructed the jury ''The jury may find the defendant, R. W. Blackett (and H. O. West) guilty of larceny as bailee, as charged in the first count of the information; *or* it may find the said defendant guilty of embezzlement as charged in the second count in the information; or it may find the defendant not guilty.'' At the close of the prosecution's case, the defendant moved that the prosecution be required to elect between the two counts of the information. The motion was denied and was renewed at the close of all the testimony when it was again denied. The jury, by its verdict, found both defendants guilty on both counts of the information. There is an unsettled situation concerning the distinction between the crime of larceny as bailee and that of embezzlement. There is a close similarity but a distinction. This distinction is difficult to define. Courts undoubtedly recognize that one exists between the two offenses, otherwise there would be no labored attempt to point out that distinction. If the two counts in the information here under discussion charged separate and distinct crimes, and we believe such is the case, then the verdict is void because the defendants could not be convicted of two separate crimes involving the same money in the same transaction. If guilty at all, the defendant is entitled to know whether it is of one charge or the other, and if, as we believe, there were two crimes charged, the district attorney should have been required to elect as to which should be submitted to the jury. That there is an essential difference between the two crimes is at once apparent, in that one requires a limitation such as would follow a bailment, and the other lacks any limitation. It is no answer to the objection to say that there was sufficient evidence to justify, or that the jury would probably have found a

verdict of guilty under one or the other of the counts, and that therefore the defendants have not been injured. It cannot be denied that they were entitled to an exact and specific determination of a fact, by the verdict of the jury. The court imposed one sentence on the verdict. This verdict was contrary to the express instructions of the court. Verdicts that are contrary to a clear and unambiguous instruction, such as was here given, evidence either a confusion in the minds of the jurors or that they were prejudiced against the defendants. Such a display could have a tendency to unduly influence the court in its imposition of sentence. For these reasons, the verdict is inconsistent and void.

No particular effort has been made, in the writing of this opinion, to confine the facts or the statement of the law strictly applicable to the defendant Blackett, since the trial proceeded against both defendants, Blackett and West. It is now sufficient to say that as to the defendant Blackett, since he prosecuted this separate writ of error, the judgment should be, and it is, reversed.

Mr. Chief Justice Butler, Mr. Justice Hilliard and Mr. Justice Bouck specially concur.

Mr. Justice Burke and Mr. Justice Young dissent.

Mr. Chief Justice Butler, concurring.

For the following reasons, I concur in the reversal of the judgment:

The court instructed the jury as follows:

"An agent of a corporation is presumed to have that knowledge of its affairs particularly under his control and management which, by the exercise of due diligence, he would have ascertained."

There was no evidence that Blackett personally had the money in his possession or that it was under his control and management, or that he personally converted the same to his own use or to the use of the corporation.

It therefore was necessary to show that in some manner he aided, abetted, assisted, advised or encouraged some other person in the commission of the crime; and, of course, it was necessary to show that he had knowledge of the acts or plans of such person. Whether or not he had such knowledge and whether or not he had a criminal intent were questions of fact to be determined by the jury.

Doubtless the instruction in question was given because of similar language in the opinion in *Overland Cotton Mill Co. v. People,* 32 Colo. 263, 269, 75 Pac. 924. But that language must be taken in connection with the nature of the case and the facts then before the court. In that case a corporation and one Sutliffe were prosecuted jointly for violating an act forbidding the employment of children under fourteen years of age in any mill or factory. The act charged was malum prohibitum, not malum per se. The defendants were convicted and the conviction was affirmed. Sutliffe was assistant superintendent of the company's mill, and had the authority to hire and discharge employees. We said: "It thus appears from the testimony that, by reason of his relationship to the company, and the performance of his duties, that he either knew, or, by the exercise of due diligence upon his part, should have known, that a minor under the prohibited age was in the employ of the company. For this reason, he must be held as having violated the statute, for it was within his power, by virtue of the relationship he bore to the company, to have prevented the employment."

As applicable to that situation, we used the following language: "An agent of a corporation is presumed to have that knowledge of its affairs particularly under his control and management which, by the exercise of due diligence, he would have ascertained."

There were cited to sustain that statement 21 A. & E. Ency. of Law, p. 896, and *People v. McClure,* 27 Colo. 358, 61 Pac. 612. In the former it is said that "as a

general rule'' that is the law. Civil cases only are cited in support of the text. The McClure case was a prosecution for receiving and assenting to deposits in an insolvent bank. The statute provides that the failure of a bank at any time within thirty days after a deposit is prima facie evidence of knowledge on the part of the person charged that such bank was insolvent at the time of its reception. McClure was president of the bank, and his ignorance, if any, was due to criminal negligence. We said:

"Of course, *mere* negligence does not, but *criminal* negligence does, supply the place of intention, or guilty knowledge, under this act. * * *

"After the bank was insolvent, and after defendant knew it, or would have known it, had he not kept himself in ignorance of its financial condition by *criminal* negligence, he neither revoked the authority of the teller, nor did anything to discourage or put a stop to the taking of deposits by closing the doors, or giving notice that deposits would not be received. By such conduct he clearly assented to the reception of the deposits.'' (Italics in last paragraph are mine.)

A distinction exists between acts that are malum prohibitum, e. g., the violation of statutes prohibiting employment of children in mills and the violation of statutes forbidding the sale of intoxicating liquors without a license or at certain times, and acts that are malum per se, e. g., murder, larceny and embezzlement. A less exacting rule concerning guilty knowledge and intent is sometimes applied in cases involving acts malum prohibitum than in cases involving acts malum per se. In the latter class of cases negligence, to take the place of criminal knowledge or intent, must be, not mere negligence but criminal negligence. Section 6633 of Compiled Laws is as follows: "A crime or misdemeanor consists in a violation of a public law in the commission of which there shall be an union or joint operation of act, and intention or *criminal negligence*.'' (Italics are

mine.) The court properly gave an instruction in that language.

Instruction 15, while it states the law applicable in certain civil cases, and perhaps in certain criminal cases involving acts malum prohibitum, should not be given in criminal cases involving acts malum per se. It was prejudicial error to give it in the present case, where a criminal intent is an essential element of the crime charged. In the circumstances of this case criminal intent could be established only by evidence showing actual knowledge. on the part of the defendant of the wrongful acts of some other officer or officers of the company, or by evidence showing that the defendant's ignorance thereof was due to *criminal* negligence on his part. The instruction informed the jury, in effect, that even though the defendant did not have actual knowledge of the wrongful acts of the other officer or officers, nevertheless he was charged with knowledge thereof as a matter of law if his ignorance was the result of mere negligence on his part. That, I respectfully submit, is not the law applicable to this case.

In my opinion, the giving of instruction 15 was seriously prejudicial to the defendant and was reversible error.

MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK concur herein.