No. 15,721.

Seebass *v.* The People.
(182 P. [2d] 901)

Decided June 23, 1947.

Mr. A. X. Erickson, Mr. Don B. Oliver, for plaintiff in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Mr. James S. Henderson, Assistant, for the people.

*In Department.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

A CRIMINAL prosecution. One Bagnall and plaintiff in error, in that order, were jointly informed against in four counts, involving a single transaction, which was originated and concluded the same day, May 14, 1943, and concerns the identical money, in each instance alleged to be in the sum of $853.58. Considering that the legal sufficiency of the allegations of the several counts of the information is not challenged on error, an adequate statement of the charges is as follows: The first count charged larceny as bailees, the second count embezzlement, the third count conspiracy to commit larceny, and the fourth count conspiracy to commit embezzlement. Both defendants were convicted on counts one and three, and suffered judgment of sentence to the state penitentiary. Only plaintiff in error seeks review, and while he assigns as error, and argues many points, only certain thereof, to be identified as we proceed, will be discussed.

We pause to state that plaintiff in error filed motions to quash as to the several counts of the information, and for bill of particulars, which were heard and denied previous to his arraignment. After arraignment and entry of plea of not guilty, he filed a petition for severance, that is to say, for a trial separate and apart from defendant Bagnall, which was denied. These motions and petitions were heard and determined by a judge other than the one who presided at the trial. Otherwise expressed, when the judge who tried the case assumed that role, the legal sufficiency of the information, its adequacy and detail of statement, and the question of the right of plaintiff in error to a separate trial, already had been determined and adjudged.

The major procedural question has to do with the

denial of the petition of plaintiff in error for a trial separate and apart from Bagnall, and rulings in the course of the trial on the admissibility of evidence consistent with such denial; the over-all question on the merits being, Was plaintiff in error a bailee of the money involved in the prosecution?

■ In the petition for severance, which was based upon section 484, chapter 48, '35 C.S.A., there was set forth in exhaustive detail the situation as it pertained to the respective parties defendant, how they differed in their legal relationship to the prosecuting witness, and how diverse was their roles in the transaction of which she complained. In particulars of controlling importance, there was pointed out items of evidence clearly competent and admissible as against petitioner's codefendant, but wholly incompetent as against himself. The record is replete with instances of the receipt of such evidence, and, although objection was interposed by plaintiff in error, it was admitted generally. The petition made plain that Bagnall, petitioner's codefendant, not the petitioner, was the representative of the complaining witness; that only to Bagnall did she entrust the possession of her securities, moneys and cash items; and only he had authority to handle and make investment of her funds. Evidently, the petition was drawn in the light of our decisions on the point. *Robinson v. People,* 76 Colo. 416, 232 Pac. 672; *Cook v. People,* 56 Colo. 477, 138 Pac. 756; *Moore v. People,* 31 Colo. 336, 73 Pac. 30; *Davis v. People,* 22 Colo. 1, 43 Pac. 122. Not only was petitioner "the only defendant who might be prejudiced by a joint trial," but properly he was the moving party to that end. *Cook v. People, supra.* The petition for severance, as we are persuaded, was sufficient in form and ample in statement.

It will aid in an understanding of the case, we think, to set forth a resume of the evidence of the prosecuting witness, Julia E. Caruthers, in which she gives her version of her relationship to Bagnall, and to plaintiff in error Seebass who is prosecuting this writ of error. Mrs.

Caruthers, seventy-two and a widow, was the sole heir of her deceased husband, whose estate consisted of some eighty thousand dollars in United States Treasury Bonds. Mrs. Caruthers testified that in the early summer of 1942, defendant Bagnall was brought to her home and introduced by a man she recalled having seen in company with her husband in his lifetime; that Bagnall "wanted to interest me in investing in a lead and zinc mine near Harrison, Arkansas, the Primrose mine," and "said that he was a graduate of the University of Colorado in mining and engineering and that he was an experienced bond man and made a success in the bond business." As the result of her conversation with Bagnall, she made investments in the Primrose mine that same summer. In the meantime, Bagnall learned of her bonds and advised her that in the interest of greater returns she should make sale of such securities and reinvest otherwise. On the strength of such advice, she began in 1943 to "invest in other securities." Before doing so she discussed the matter with "no one but Mr. Bagnall." In response to the question, "Who was to select the securities which you purchased?" she testified, "Mr. Bagnall." Quoting further from the record: "Q. Who was to sell them, Mrs. Caruthers? A. Mr. Bagnall. Q. Who was to determine when certain securities should be bought and sold? A. Mr. Bagnall. Q. Did you know anything about the stock market or the security market? A. Not a thing. Q. Did Mr. Bagnall ever tell you through whom those stocks and bonds would be purchased? A. Through Mr. Seebass. Q. What did he ever tell you about Mr. Seebass?" Over the objection of defendant Seebass, Mrs. Caruthers testified Bagnall "said that he had dealt with him for a good many years and he also had inside information on this—you know, all these stocks and bonds. Q. As a result of these conversations with Mr. Bagnall, did you begin to invest in various stocks and bonds? A. I did." On cross-examination of Mrs. Caruthers, the following appeared: "Q. How long had you

known the defendant Seebass? A. Since the trial started. Q. Had you ever seen him? A. I never saw him before. Q. Did you ever talk with Mr. Seebass? A. Never. Q. Did you ever have any conversation of any kind with Mr. Seebass? A. None whatever. Q. And did you ever say to Mr. Seebass at any time that any transaction that you had ever had with him was unsatisfactory to you in any sense or manner? A. No, I never had any conversation with Mr. Seebass." It was not claimed, or even suggested, by or through testimony of Mrs. Caruthers or any other witness, or by means of documents or writings or otherwise, or at all, that at any time there was any communication between the prosecuting witness and Seebass. Indeed, in the course of the trial the district attorney stated that "all her dealings with Mr. Seebass were through Mr. Bagnall, that she never saw Mr. Seebass." It is clear that Mrs. Caruthers placed her full trust in Bagnall, and only in him. It is no less apparent that at no time, the present instance included, did she entrust Seebass with money, or checks or drafts or other writings calling for money or that were cashable, or property of any kind or nature. On the contrary, she constantly was entrusting Bagnall, the other defendant, and only him, with money, checks and other negotiable securities, including the check she gave him for the purpose of buying the shares of stock involved in the transaction out of which the present difficulty arose. In whatever dealings her trusted representative had with Seebass, including this one, as abundantly appears, the latter acted for himself, or, as stated in the record "as principal," and never as agent for Mrs. Caruthers or any other.

Over the objection of counsel for plaintiff in error, the district attorney was permitted to show Bagnall's acquaintance and close association with Mrs. Caruthers, how he induced her to invest in the Primrose mine in Arkansas and the Chemical Research Company, a Denver concern, and to sell one-fourth of her eighty thou-

sand dollars of government bonds and invest the proceeds otherwise under his direction. Also, he was allowed to introduce a book (Exhibit G), to which counsel for Seebass objected, and which, as Mrs. Caruthers testified, was a "record of her purchases and sales of these securities." The district attorney conducted the following examination relative to that exhibit: "Q. Under what circumstances did you make these entries? A. I got a book and took it to his office. Q. Whose office? A. Mr. Bagnall's office. Q. When did you make the entries in that book which show your purchases and sales? A. They were supposed to be copies from his book. He gave them to me. Q. Mr. Bagnall? A. Mr. Bagnall gave them to me." (Counsel moved to strike the testimony in so far as Seebass was concerned, which was overruled and exception reserved.) The district attorney continued his examination of Mrs. Caruthers. "Q. Were all of the entries, such entries, made in the presence of Mr. Bagnall? A. They were. Q. Was all the information contained in this [Exhibit G] obtained from Mr. Bagnall? A. Yes, sir." (Then followed objections by counsel for Bagnall, the other accused, which were overruled.) The district attorney again took up the examination of Mrs. Caruthers. "Q. All these entries which appear on pages 182 and 183 [of Exhibit G], marked 'Sales', were made on information given you by Mr. Bagnall? A. They were." (Objection by counsel for Seebass, which was overruled, and exception taken). "Q. As to pages 184 and 185, which are headed 'Bought', were all of those items made based upon information given to you by Mr. Bagnall? A. They were." (Objected to, "because none of the evidence is in any sense admissible as to defendant Seebass," which was overruled and exception noted). "Q. Were all of them made in the presence of the defendant Bagnall? A. They were. Q. Now, Mrs. Caruthers, under the heading of 'Bought', do you find an item, page 185, relating to the purchase of United States and International? [This is the transaction involved in the prosecution.] A.

I do, May 14, forty U. S. and International first preferred, then $3,920. Q. Who gave you that figure of $3,920? A. Mr. Bagnall." Subsequently, testifying concerning the same exhibit, Mrs. Caruthers said: "The things in this book, Judge, are the things that Bagnall told me to put in." Of course that book, clearly competent as against Bagnall, was wholly incompetent as against Seebass. Nevertheless, although constantly challenged by counsel for Seebass, it was unconditionally admitted generally. Bagnall, and he alone, as Mrs. Caruthers testified, selected the securities she purchased, and only he "was to determine when certain securities should be bought and sold," including the purchase here in question, as already seen. Over objection by counsel for Seebass, Mrs. Caruthers was permitted to testify that she had sold one-fourth of her government bonds, of the value of twenty thousand dollars, but on cross-examination she freely admitted, and evidently never had intended to imply otherwise, that Bagnall sold those bonds for her through J. A. Hogle and Company, well-known bond brokers, and not through Seebass.

In considering the petition for severance, it should be borne in mind that due to complaint by Mrs. Caruthers, Bagnall, separately, and jointly with defendants other than plaintiff in error, was informed against in several prosecutions, on items involving his and their wrongful use of her funds, and in the instance here with plaintiff in error, which had to do, not with a course of swindling and overreaching, but, with a single transaction, occurring on a date definitely stated, and involving a specific sum of money alleged to belong to the prosecuting witness, which, allegedly, had come into the possession of Bagnall *and* plaintiff in error as bailees, and been converted to their own use. But in the course of the district attorney's attempt to prove the simple, direct and definite charge, alleged as of a certain date, he was permitted to show the several instances and general history of Bagnall's dealings with Mrs. Caruthers' money and

securities, quite as if Seebass had had part in such dealings, which as appears from the record, was not the case. There was no evidence that Seebass was her agent at any time, or that she authorized him to handle or invest her funds, or that other than in payment for stocks purchased by Bagnall, as her authorized agent, from Seebass as owner of such stocks, did he receive money that had been hers.

Now, as to the "$3,920" item which the prosecuting witness says Bagnall told her was what he paid Seebass for "forty U. S. and International first preferred," and as shown by his books, and which, under Bagnall's guidance, she rewrote in her book (Exhibit G). The story is simple and revelatory. It has to do with the sale of a residence belonging to Mrs. Caruthers. Bagnall, and only Bagnall, advised her to sell, and invest the proceeds in the stock mentioned above. He told her the forty shares would cost $3,920, or ninety-eight dollars per share. She sold the house for $4,233.58, covering which she received a check payable to her order. Instead of depositing the check, she indorsed it in blank and gave it to Bagnall, and in exchange therefor Bagnall gave her a receipt for $3,920 and his check for the difference, or $313.58. The receipt which he gave to Mrs. Caruthers carried the notation that he was to use the $3,920 mentioned for the purchase of the stock from Seebass. Seebass transferred the desired shares to Mrs. Caruthers, and issued to her a memorandum on a standard blank form showing that as "principal" he had sold to her forty shares of the mentioned stock at $84.50 per share, or for $3,380, and delivered the stock certificate and memorandum to Bagnall, the man she testified was to "select" the securities she was to purchase, and determine "when" to purchase. In payment, Bagnall gave Seebass the check for $4,233.-58, endorsed by Mrs. Caruthers in blank, as we have seen, and the difference between that check and the price of the stock, or $858.58, the people's expert witness testified—and there was no showing, or hint, otherwise

—was paid to Bagnall, in cash. But notwithstanding that Bagnall had paid only $3,380 for the stock, as we have seen, he entered on his books the price paid as $3,920, while Seebass' books, as the same people's expert testified, disclosed the real price, of $3,380. Subsequently Mrs. Caruthers "got a book [Exhibit G] and took to his office [Bagnall's]," and pursuant to "the things that Bagnall told me to put in," she made entries in her "book." Among the entries made as Bagnall instructed her, was the one showing that the stock in question cost her $3,920. In no sense was Exhibit G a book of original entries, although, as against Bagnall, it was admissible as a memorandum of admissions he had made to the complaining witness. Clearly, as we perceive, as against Seebass it was incompetent, most damaging, and materially prejudicial; but notwithstanding his counsel's timely objections thereto it was admitted unconditionally, precisely as if competent against both defendants.

That the evidence objected to generally was incompetent was not received below on any direct holding otherwise, but, rather upon the premise that since there was a charge of conspiracy, such evidence, otherwise incompetent, thereby became competent. But that doctrine does not conform to our pronouncements. "The language of this statute," as we have said, "is positive and unequivocal, and when a case, as therein contemplated, is presented, it is made the duty of the court to grant a severance as a matter of right. * * * But it is contended," as we further observed there, "that the statute was not intended to apply to cases of conspiracy. With this we do not agree. We regard the statute as applicable to cases of conspiracy, * * *. That conspiracies are proper cases for severance, see *Casper v. State,* 47 Wis. 535; *Watson v. State,* 16 Lea (Tenn.) 604; *Willey v. State, supra; Regina v. Ahearn,* Cox's Crim. Law Cases, vol. 6, p. 6." *Davis v. People, supra.* A further statement in the Davis case is applicable. "We think this case," as said there, and fittingly may be said here, "well illust-

rates the wisdom of the statute, and the injurious results that usually follow from the introduction of testimony admissible against one defendant and inadmissible as to the others." The petition for severance in the instant case should have been granted. Group of cases cited, supra. Also, see *Askew v. People,* 23 Colo. 446, 48 Pac. 524; 70 A.L.R., p. 1179, note a.

▉ Reverting now to the query posed early in this opinion, "Was plaintiff in error a bailee of the money involved?" It clarifies the problem to keep in mind that, "Larceny by bailee is not a common-law offense." *Helser v. People,* 100 Colo. 371, 68 P. (2d) 543. Also, that, "The charge of larceny as bailee, * * * necessarily must carry a bailment." *Blackett v. People,* 98 Colo. 7, 52 P. (2d) 389. "In order that such an offense exist there must be a bailment and the relationship of bailor and bailee." *People v. Wildeman,* 325 Ill. 99, 156 N. E. 257. Recalling that Mrs. Caruthers did not know Seebass, had never seen him or had communication with him in any form or manner, and that in the transaction involved, and the prosecution elected to rely thereon, as well, indeed, as on all transactions mentioned, but not relied upon, Seebass did not act as agent for Mrs. Caruthers, but in each instance acted for himself. In the matter of the charge here, as seen earlier, and in which he acted as "principal," he sold her forty shares of certain stock that he owned, covering which he caused a certificate to be made out in her name, and that certificate, together with a memorandum of the transaction showing that he sold the stock to her as $84.50 per share, and that the total cost to her was $3,380, was delivered to Bagnall. The people's expert witness testified that in Seebass' files he found a receipt for the certificate of the stock, signed by Mrs. Caruthers, and in Bagnall's files the memorandum from Seebass to Mrs. Caruthers, as purchaser, showing what the stock had cost her, as per share and in total, as already set forth. Seebass' books, as the same witness testified, and as already we have observed, disclosed that

the sale had been for $3,380, and not $3,920, as Bagnall's books and his receipt to Mrs. Caruthers indicated was the sum to be paid for the stock. On the faith of Bagnall's representations as to what the stock was to cost her, concerning which there was no evidence that Seebass had knowledge, she made a blank endorsement of a good check payable to her order, in the sum of $4,233.58, and gave it into Bagnall's keeping for the purpose stated. Since the amount of that check exceeded the cost of the proposed purchase, as her agent had told her, Bagnall gave her his check covering the excess, or for $313.58. Bagnall, already enjoying general authority to select and purchase stocks for Mrs. Caruthers, and specific authority in this instance to buy the stock in question, proceeded to consummate the purchase. In payment therefor he turned over the check for $4,233.58, endorsed by Mrs. Caruthers, as already seen. That check exceeded the purchase price of the stock by the sum of $855.58, and since the check was good, the sum mentioned was returnable from Seebass as change. Did he return it? The only witness testifying in relation thereto, the people's expert, stated that he "traced" that exact sum in cash to Bagnall, the prosecuting witness' agent. If Bagnall received the "change," not denied by him, nor questioned by the prosecuting witness, and of which there is every legal intendment, May it be said that in returning the excess of the check to Bagnall, plaintiff in error did not discharge his every duty in the premises? The law, we think, does not justify a negative answer. Besides, as we have seen, there not only must "be a bailment," but, as between the prosecuting witness and plaintiff in error, the "relationship of bailor and bailee" must have existed, concerning which there was entire absence of evidence. As already we have emphasized, the prosecuting witness did not know plaintiff in error, nor did she trust him with anything. On the other hand she knew Bagnall, trusted him with much, and particularly with the fund involved in this prosecution. Bagnall

made his books conform to his misrepresentations to the trusting prosecuting witness, while the books of plaintiff in error reflected the truth.

In addition to the fact that the court erred in denying severance, to which, in the interest of emphasizing a praiseworthy statutory procedural rule, we have addressed ourselves at some length, we are persuaded that as against plaintiff in error, the case failed altogether, and his motion for a directed verdict, interposed at the close of the people's case, should have been granted.

Let the judgment be reversed, and on receipt of our order of remand, the trial court will enter order of dismissal.

Mr. Chief Justice Burke and Mr. Justice Hays concur.